FILED

2011 NOV -1  PM 2: 21

JOSEPH L. GOLDEN, ESQ. (S.B. No. 61293)
Email: jlgoldenesq@verizon.net
LAW OFFICE OF JOSEPH L. GOLDEN
1801 Century Park East, 24th Floor
Los Angeles, California 90067-2302
Telephone: 310-556-9666
Facsimile: 310-556-9625

Attorney for plaintiff Colwel Platinum Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**CV11-9062 - PA (MANx)**

| | |
|---|---|
| COLWEL PLATINUM ENTERTAINMENT, INC., a New York corporation,<br><br>        Plaintiff,<br><br>v.<br><br>ADAM LAMBERT, an individual,<br><br>        Defendant. | Case No.:<br><br>COMPLAINT FOR:<br><br>1.   DAMAGES;<br><br>2.   DECLARATORY RELIEF<br><br>DEMAND FOR JURY TRIAL |

As and for its complaint against the defendant named herein, plaintiff Colwel Platinum Entertainment, Inc. ("plaintiff") alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over the first claim for relief under 17 U.S.C. § 101, et. seq., and 28 U.S.C. §§ 1331 and 1338(a) in that the

claim for relief arises under the Copyright Act of 1976, as amended. This Court has subject matter jurisdiction over the second claim for relief under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy, excluding interest and costs, exceeds $75,000. This Court also has subject matter jurisdiction over the second claim for relief under 28 U.S.C. § 1367.

2.     This Court is the proper venue for this action under 28 U.S.C. §1391(b) in that the acts and events giving rise to the claims for relief alleged herein arose in this District and, upon information and belief, the defendant resides in this District.

## THE PARTIES

3.     Plaintiff is, and during the material times has been, a corporation organized and existing under the laws of the state of New York. Plaintiff's principal place of business is in New York, New York.

4.     Defendant Adam Lambert ("Lambert") is, and during the material times has been, an individual and a citizen of California. Upon information and belief, Lambert has been a resident of Los Angeles County, California during all material times.

## FACTUAL BACKGROUND

5.     Lambert is a singer and recording artist. He was relatively unknown as such until he appeared on *American Idol* during its eighth season. That season aired on national television during the first half of 2009.

6.     Upon information and belief, Lambert became interested in auditioning for *American Idol* in late 2007 or early 2008. Upon further information and belief, Lambert began preparing to audition for the show in early 2008, and

participated in the July 2008 audition session. He was accepted for participation and appeared in the televised contests held during the show's season. Lambert was declared the runner up of the competition on or about May 19, 2009.

7.     Upon further information and belief, the rules governing appearances on and participation in *American Idol* when Lambert was a contestant provided, among other things, that contestants were ineligible if "as of the date of [the] audition, [they had] . . . a music recording contract . . or any other contractual arrangement that would prohibit [them] from entering into a . . . recording contract. . . ." A violation of this provision was grounds for disqualification.

8.     Between about April 2007 and September 2008, Lambert performed compositions that he had written, alone and with others, for Welsford Music Productions, LLC ("Welsford Music Productions") for the purpose of creating singles and/or an album containing sound recordings of those performances. The bulk of the recording sessions occurred before Lambert auditioned for *American Idol* and eight months before he was declared the runner up. Lambert was the only singer on the recordings made during those sessions. He was accompanied by musicians engaged by Welsford Music Productions.

9.     Lambert performed his services for Welsford Music Productions pursuant to a written Music Services Agreement with that company dated as of February 12, 2008 ("Music Services Agreement"). Lambert executed the Music Services Agreement on or about February 12, 2008.

10.     At about the same time, Lambert entered into a Co-Publishing Agreement with Wilshire Publishing Limited, a Nevada limited liability company ("Wilshire Publishing Limited"). Lambert executed the Co-Publishing Agreement on the same date he executed the Music Services Agreement. At that time, Malcolm Welsford was a member of both Welsford Music Productions and Wilshire Publishing Limited.

11.    A true and correct copy of the Music Services Agreement is attached hereto as Exhibit 1 and is incorporated herein by this reference. The parties to that agreement contemplated and intended that the compositions Lambert would be performing for Welsford Music Productions would include compositions that he had written, alone and with others, the copyright in which had been assigned and transferred to Wilshire Publishing Limited pursuant to the Co-Publishing Agreement. Thus, the agreement identifies Welsford Music Productions as the "Producer" and Wilshire Publishing Limited as the "Owner."

12.    Pursuant to the Music Services Agreement, the parties agreed as follows, among other things:

a.    Lambert agreed to "render services in connection with the production and recording of Masters, as [Welsford Music Productions] or [Wilshire Publishing Limited] may designate . . . ." Lambert agreed that his services would "include, *without limitation*, the following *and all other services reasonably required by* [Welsford Music Productions] or [Wilshire Publishing Limited]: performing and recording services as a studio musician." (italics added)

b.    Welsford Music Productions agreed to produce, release and promote the sale of singles and/or one or more albums containing the sound recordings that Lambert agreed to perform under the Music Services Agreement, thereby furthering Lambert's professional career.

c.    Welsford Music Productions also agreed to pay, and Lambert agreed to accept, as his full monetary compensation for all the services he was to render under the agreement and for all the rights he agreed to assign and transfer pursuant to that agreement, the sum of $25 per hour for each hour devoted to performing and recording "demos" and $50 per hour for each hour devoted to performing and recording final performances. Lambert agreed that neither the Music Services Agreement nor the services he was to render under

that agreement "[would be] subject to any union or other collective bargaining agreement." Thus, Lambert was not to be paid, and in fact was not paid, "union scale" compensation for the services he rendered. "Backup singers" are paid union scale for their services; featured artists are not. "Backup singers" also do not enter into agreements like the Music Services Agreement.

d.     Lambert irrevocably and unconditionally granted to Welsford Music Productions, for the benefit of Wilshire Publishing Limited, "all right, title and interest of [Lambert] in and to [his services], the Masters and all results and proceeds of [Lambert's services], including but not limited to, all materials arranged, composed, contributed, created, performed, produced, recorded, suggested or written by [Lambert] and all copyrights therein (collectively, 'Material'), and any and all rights under or related to copyright whether now or hereafter provided, and all rights to use, exploit, advertise, exhibit and otherwise turn to account any or all of the foregoing in any manner, in any and all media, now known or hereafter devised. . . ."

e.     The parties further agreed that "[a]ll Material is intended . . . to be 'works made for hire' by [Lambert] pursuant to Section 201 of Title 17 of the United States Code. . . [but that] [i]f, for any reason, any Material [was] not a 'work made for hire,' [Lambert] irrevocably and unconditionally assign[ed] to [Welsford Music Productions] for the sole benefit of [Wilshire Publishing Limited], exclusively all such Material and all Rights with respect thereto."

f.     The parties further agreed that "[Welsford Music Productions] or [Wilshire Publishing Limited] may add to, adapt, alter, arrange, change, cut, edit, mix, modify, rearrange, subtract from or otherwise revise any or all of the Material. . . in any manner as they may see fit." Lambert "irrevocably and unconditionally waive[d], and agree[d] never to assert, any so-called moral rights or 'droit moral,' or any similar or analogous rights. . . ."

g.     Lambert irrevocably and unconditionally granted Welsford Music Productions the right to use his name, nickname(s) and biography in connection with the advertising and promotion of the recordings of his performances.

13.     Lambert performed the following compositions, among others, for Welsford Music Productions pursuant to the Music Services Agreement between approximately September 2007 and June 2008: *Beg for Mercy, Rough Trade, Crawl Thru Fire, Want, Kiss and Tell, Just The Way It Is, Turning On, Runaway, Pop Goes the Camera (15 Minutes of Fame), Kiss and Tell, Sacrifice, The Circle, Mp3's Killed the Record Companies* and *I Got This.* Welsford Music Productions produced and created recordings (the "Recordings") embodying those performances. No other person performed any vocals on any of the Recordings created during those sessions.

14.     Wilshire Publishing Limited spent more than $200,000 to produce and create the Recordings. That money was spent on, among other things, pre-production and writing, "back up musicians," recording studio rentals, sound engineers and mixers.

15.     In or about July 2008, with Welsford Music Productions' and Wilshire Publishing Limited's knowledge and consent, Lambert uploaded *Kiss and Tell, Crawl Thru Fire, I Got This* and *Pop Goes the Camera (15 Minutes of Fame)* to his MySpace page so his fans and members of the public could listen to and download them..

16.     A true and correct copy of the Co-Publishing Agreement executed by Lambert is attached hereto as Exhibit 2 and is incorporated herein by this reference. Pursuant to that agreement, Lambert and Wilshire Publishing Limited agreed that, among other things:

a.     As of the date of the agreement, Lambert had written, alone and with others, the following compositions, among others: *Beg for Mercy,*

*Rough Trade, Crawl Thru Fire, Kiss and Tell, Just The Way It Is, Turning On, Run Away, Pop Goes the Camera (15 Minutes of Fame), Sacrifice, The Circle, Mp3's Killed the Record Companies* and *I Got This.*

b.     Lambert assigned 50% of his right, title and interest in those compositions, including the copyrights therein, to Wilshire Publishing Limited;

c.     Wilshire Publishing Limited agreed to pay, and Lambert agreed to accept as a recoupable advance against the writers' royalties he was to be paid under the agreement, his pro rata share of $100 for each composition written pursuant to the Co-Publishing Agreement. Lambert was to be paid his pro rata share of the writers' royalties set forth in the agreement after those advances were recouped. d.     Lambert agreed that, in the event Wilshire Publishing Limited allegedly breached the Co-Publishing Agreement, his sole right and remedy would be an action at law for damages, "and in no event shall [Lambert] be entitled to terminate or rescind [the] Agreement or any of the rights granted [thereunder] or to enjoin, restrain or otherwise impair the exploitation of Publisher's rights [thereunder]."

17.     In or about May 2006, Coldwater Entertainment Limited, then a member of Wilshire Publishing Limited, loaned Lambert $2,500 for living expenses. Lambert had not repaid that loan as of June 2008. At that time, Lambert agreed with Welsford Music Productions that the amount he owed on that loan should be offset against the amounts he was owed  under the Music Services Agreement. In June 2008, the amount Lambert was owed under the Music Services Agreement was less than the unpaid balance of the loan.

18.     As of December 2008, Wilshire Publishing Limited owed Lambert per composition advances totaling $550 under the Co-Publishing Agreement. After applying the unused portion of the $2,500 loan referred to in paragraph 17 above

pursuant to Lambert's June 2008 agreement, a total of $312.50 was due and owing. Welsford Music Productions so advised Lambert and subsequently sent him a check for that amount.

19.     In or about July, 2011, Welsford Music Productions began the final stages of preparing an album (the "Album"), ultimately entitled *Beg for Mercy*, containing the following 10 Recordings: *Beg for Mercy, Rough Trade, The Circle, Turning On, Just the Way It Is, Sacrifice, Pop Goes the Camera (15 Minutes of Fame), Mp3's Killed the Record Companies, Crawl Thru Fire,* and *Run Away*. Welsford Music Productions made arrangements to have the Album available for purchase on Amazon.com as of October 18, 2011. Amazon.com began taking pre-orders for the Album on or about October 10, 2011.

20.     In or about mid-October 2011, Lambert, through his authorized agent and pursuant to 17 U.S.C. § 512(c), sent Amazon.com a "takedown notice" dated October 11, 2011. A true and correct copy of what plaintiff believes to be that "takedown notice" is attached hereto as Exhibit 3 and is incorporated herein by this reference.

21.     Upon information and belief, Amazon.com removed the Album from its website on or about October 14, 2011 in response to that notice. Upon further information and belief, Amazon.com had received a substantial number of "pre-orders" for the Album by then. Upon further information and belief, Amazon.com advised those customers that the Album no longer was available for sale and refunded the amounts they had paid with their pre-orders.

22.     Through a series of agreements and assignments, Welsford Music Productions and Wilshire Publishing Limited transferred and assigned their rights under the Music Services Agreement and Co-Publishing Agreement to plaintiff. By reason of those assignments, plaintiff is the successor in interest to Welsford Music Productions and Wilshire Publishing Limited and owns all the rights and assets

that those companies acquired from Lambert under and pursuant to those two agreements.

## FIRST CLAIM FOR RELIEF

[Damages Under 17 U.S.C. § 512(f) -- Against Lambert]

23.     Plaintiff repeats and incorporates herein by this reference, each of the allegations contained in paragraphs 1 through 22 above, and each of them.

24.     In the "takedown notice" sent to Amazon.com, Lambert claimed, among other things, that (a) the Recordings in the Album were "demos" and were not intended to be released without Lambert's consent, (b) that he had not consented to those Recordings being sold to the public, and (c) that in June and July 2009, Lambert had rescinded the agreements pursuant to which the Recordings and underlying compositions had been created because of "the undisputed failure to pay the contractual consideration." Lambert further claimed that by reason of that rescission, all the rights, including copyrights, in those Recordings and compositions had "return[ed] to [him]."

25.     The "takedown notice" further demanded that Amazon.com remove all advertisements for the Album and to refrain from selling any on and after that date. As alleged, Amazon.com complied with Lambert's demand.

26.     Upon information and belief, Lambert, through his authorized agent and representative, knowingly materially misrepresented to Amazon.com in the "takedown notice" that Amazon's promotion and sale of the Album infringed Lambert's rights. Among other things, Lambert and his authorized representative knew or should have known had they acted with reasonable care or diligence in investigating the underlying facts and circumstances that, among other things, (a) there had not been a material failure of consideration under the Music Services Agreement or Co-Publishing Agreement entitling Lambert to rescind either of them, (b) plaintiff's predecessors in interest then owned all the right, title and

interest (including the copyrights) in the Recordings and 50% of the right, title and interest (including the copyrights) in the underlying compositions, (c) they (and thus plaintiff) had the right to promote and distribute the Album on Amazon.com and through other channels, and (d) Lambert did not have a legally valid right to object to or prevent that promotion and distribution.

27.    Plaintiff has sustained injury and damages as a proximate result of Lambert's sending the materially and knowingly false "takedown notice" to Amazon.com. Those damages include, but are not limited to, the sales revenue of the Album lost because Amazon.com complied with the "takedown notice" and refunded to the purchasers, the amounts they had paid with their pre-orders and the revenue that would have been earned from sales of the Album on and after October 18, 2011 had the Album not been removed.

## SECOND CLAIM FOR RELIEF
### [Declaratory Relief – Against Lambert]

28.    Plaintiff repeats and incorporates herein by this reference, each of the allegations contained in paragraphs 1 through 25 above, and each of them.

29.    An actual controversy has arisen and now exists between plaintiff and Lambert concerning plaintiff's ownership of the Recordings and underlying compositions, plaintiff's rights under the Music Services Agreement and the Co-Publishing Agreement, and plaintiff's rights to promote and sell the Album and the Recordings contained in the Album as singles. Plaintiff contends, among other things, that:

a.    It owns all right, title and interest (including copyrights) in the Recordings;

b.    It owns 50% of, *inter alia*, "the Lambert share" of the right, title and interest (including copyrights) in the underlying compositions;

c.    It has the unconditional right to promote and sell the Recordings, either as singles or as contained in the Album;

d.    That neither the Music Services Agreement nor the Co-Publishing Agreement were validly rescinded in that, among other things, (i) no valid grounds existed for rescinding either and (ii) Lambert agreed that he could not rescind the Co-Publishing Agreement even if Wilshire Publishing Limited had breached it; and

e.    The Music Services Agreement and the Co-Publishing Agreement remain in effect and valid in all respects and that Lambert is bound by the provisions of those agreements.

30.    Upon information and belief Lambert denies that (a) the Music Services Agreement and the Co-Publishing Agreement remain in effect and valid in all respects; (b) that plaintiff has the legal right to promote and sell the Album and/or any of the Recordings as singles; (c) and that plaintiff owns all right title and interest (including copyrights) in the Recordings and 50% of "the Lambert share" of the right title and interest (including copyrights) in the underlying compositions.

31.    Plaintiff desires a judicial determination of (a) its rights and obligations under the Music Services Agreement and the Co-Publishing Agreement, (b) the current effectiveness and enforceability of those agreements against Lambert, and (c) its right, title and interest (including copyrights) in the Recordings and "the Lambert share" of the underlying compositions. Specifically, plaintiff desires a judicial declaration that, among other things:

a.    It owns all of the right, title and interest (including copyrights) in the Recordings and all other recordings created pursuant to the Music Services Agreement;

b.     It owns 50% of "the Lambert's share" of the right, title and interest (including copyrights) in the underlying compositions that Lambert wrote or co-wrote pursuant to the Co-Publishing Agreement;

c.     It has the unconditional right to promote and sell the Recordings, either as singles or as contained in the Album;

d.     That neither the Music Services Agreement nor the Co-Publishing Agreement were validly rescinded; and

e.     The Music Services Agreement and the Co-Publishing Agreement remain in full force and effect and valid in all respects and that Lambert is bound by the provisions of those agreements.

32.     The requested declaration is necessary and appropriate at this time so that plaintiff and Lambert may know (a) their respective rights, duties and obligations under the Music Services Agreement and the Co-Publishing Agreement and (b) their respective rights, title and interests (if any) in the Recordings covered by the Music Services Agreement and the compositions covered by the Co-Publishing Agreement.   The requested declaratory relief is necessary and appropriate at this time to avoid a multiplicity of lawsuits and other proceedings in the future.

WHEREFORE, plaintiff prays for entry of judgment against Lambert as follows:

On the First Claim for Relief:

1.     For an award of damages according to proof at trial pursuant to 17 U.S.C. § 512(f).

On the Second Claim for Relief:

33.     That the Court declare, among other things, that:

a.    Plaintiff owns all of the right, title and interest (including copyrights) in the Recordings and all other recordings created pursuant to the Music Services Agreement;

b.    Plaintiff owns 50% of "the Lambert share" of the right, title and interest (including copyrights) in the underlying compositions that Lambert wrote or co-wrote pursuant to the Co-Publishing Agreement;

c.    Plaintiff has the unconditional right to promote and sell the Recordings, either as singles or as contained in the Album;

d.    That neither the Music Services Agreement nor the Co-Publishing Agreement were validly rescinded; and

e.    The Music Services Agreement and the Co-Publishing Agreement remain in full force and effect and valid in all respects and that Lambert is bound by the provisions of those agreements.

On all Claims for Relief:

1.    That plaintiff be awarded its costs of suit incurred herein, including its attorneys' fees pursuant to 17 U.S.C. §§ 505 and/or 512(f); and

2.    That plaintiff have such other and further relief as the Court deems just and proper

Dated: November 1, 2011         JOSEPH L. GOLDEN
                                LAW OFFICE OF JOSEPH L. GOLDEN


                                By: _____
                                    Joseph L. Golden
                                Attorney for Plaintiff Colwel Platinum
                                    Entertainment, Inc.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable to a jury.

Dated:  November 1, 2011          JOSEPH L. GOLDEN
                                  LAW OFFICE OF JOSEPH L. GOLDEN


By: _____
     Joseph L. Golden
   Attorney for Plaintiff Colwel Platinum
            Entertainment, Inc.

Exhibit 1

## MUSIC SERVICES AGREEMENT

1.    Identification.   This Agreement (the "Agreement"), dated as of FEB 12th, 2008, is entered into between the undersigned ("Artist") and Welsford Music Productions, LLC ("Producer").

2.    Background.   Producer has been engaged by Wilshire Publishing Limited. ("Owner") to record and produce master recordings (each, a "Master") for Owner embodying musical compositions owned or controlled by Owner (each, a "Composition").

3.    Services.

(a)    Producer hereby engages Artist to render services in connection with the production and recording of Masters, as Producer or Owner may designate, for recording session(s) at Welsford Studios, 417 South Hill Street, Suite #207, Los Angeles,  90013, California, starting on FEB 12th, 2008 and continuing thereafter until OCTOBER 1st, 2008 as Producer may require, as such session(s) may be extended or substituted. Artist's services (the "Services") include, without limitation, the following and all other services reasonably required by Producer or Owner: performing and recording services as a studio musician.

(b)    Artist shall render the Services diligently and conscientiously, devoting Artist's best efforts, talents and abilities thereto, subject to the supervision, control and direction of, and/or in collaboration with, such persons as Producer may designate. Producer's judgment shall be final and controlling in all matters respecting the rendition of the Services.

4.    Compensation. As full and complete compensation for all of the Services, all of the results and proceeds thereof, all rights now or hereafter granted to or otherwise acquired by Producer or Owner and all representations, warranties and agreements of Artist hereunder, for each day on which Artist renders Services at Producer's request, Producer shall pay Artist the following (the "Invoiced Rate"): to be determined on a monthly basis, the Invoiced Rate is based on $25 per hour inclusive for demos and $50 per hour for final performances. Artist acknowledges that: (a) Artist shall render the Services as an independent contractor for Producer; (b) Artist shall be solely responsible for all payroll taxes and other obligations of an employer in connection with the Services; (c) except for the Invoiced Rate, Artist is not entitled to any other compensation in connection with the Services, or any of the results and proceeds thereof, regardless of whether the Services are rendered on Saturdays, Sundays or holidays, or after the expiration of any particular number of hours during the day; and (d) neither this Agreement nor the Services are subject to any union or other collective bargaining agreement.

5.    Rights and Ownership.

(a)    Artist hereby irrevocably and unconditionally grants to Producer, for the sole benefit of Owner, exclusively all right, title and interest of Artist in and to Artist's Services, the Masters and all results and proceeds of the Services including, but not limited to, all materials arranged, composed, contributed, created, performed, produced, recorded, suggested or written by Artist and all copyrights therein (collectively, "Material"), and any and all rights under or related to copyright whether now or hereafter provided, and all rights to use, exploit, advertise, exhibit and otherwise turn to account any or all of the foregoing in any manner, in any and all media, now known or hereafter devised, throughout the universe, in perpetuity, in any and all languages (collectively, the "Rights"). All Material is intended by Artist and Producer to be "works-made-for-hire" by Artist pursuant to Section 201 of Title 17 of the United States Code, as amended or replaced, as specially ordered or commissioned by Producer, for the sole benefit of Owner, as a contribution to a collective work. If, for any reason, any Material is not a "work-made-for-hire," Artist hereby irrevocably and unconditionally assigns to Producer, for the sole

benefit of Owner, exclusively all such Material and all Rights with respect thereto. Artist acknowledges that Artist has and will have no right, title or interest in or to any of the Compositions.

(b)    Producer or Owner may add to, adapt, alter, arrange, change, cut, edit, mix, modify, rearrange, subtract from or otherwise revise any or all of the Material, or combine it with any other material, in any manner as they may see fit. Artist hereby irrevocably and unconditionally waives, and agrees never to assert, any so-called moral rights or "droits moral," or any similar or analogous rights recognized anywhere at any time. Artist hereby irrevocably and unconditionally assigns to Producer, for the sole benefit of Owner, all rights, if any, of Artist to authorize, prohibit or control the rental, lending, fixation, transmission, reproduction and/or other exploitation of any of the Material by any media or means now known or hereafter devised as may be conferred upon Artist under any applicable law, regulation or directive (collectively, "EEC Rights"). The compensation payable to Artist hereunder includes, without limitation, all equitable remuneration payable to Artist in respect of the exploitation of any EEC Rights. Artist hereby irrevocably and unconditionally: (i) grants to Producer, for the sole benefit of Owner, the right to collect and retain for Owner's own account any and all amounts payable to Artist with respect to any of the EEC Rights; and (ii) directs any collecting societies or other persons receiving such amounts to pay such amounts to Owner.

(c)    Artist hereby irrevocably and unconditionally grants to Producer, for the sole benefit of Owner, the rights, in perpetuity throughout the universe and in any and all languages, to use and give publicity to, and to license others to use and give publicity to, Artist's name, nickname(s) and biography in any medium for information purposes or in connection with advertising, publicizing or otherwise exploiting any of the Services, the results and proceeds thereof, the Masters and/or the Material, or any part or element thereof, in and in connection with the exploitation of any of the Rights; provided, however, that no such use shall constitute a direct endorsement by Artist of any other product or service.

6.    No Obligation to Use Services.  Neither Producer nor Owner shall have any obligation actually to use Artist's Services or any of the results or proceeds thereof, or to exercise any of the rights of or granted to Producer or Owner hereunder, or to distribute, produce, release or exploit any of the Demo, Library or Masters, or to continue any of the foregoing if commenced.

7.    Artist's Representations and Warranties.  Artist hereby represents and warrants to, and further agrees with, Producer, for the benefit of Producer and Artist, as follows:

(a)    Artist is free to enter into and perform this Agreement and to grant the rights herein granted and is not, and will not be, subject to any obligation or disability which will or might hinder or prevent the performance and completion by Artist of all agreements to be kept or performed by Artist hereunder. Artist has not made and will not make any assignment or agreement which will or might conflict with or impair the complete enjoyment of the Rights hereunder.

(b)    All Material is and shall be wholly original with Artist except as the same may be copied from works or other material in the public domain or furnished by Producer or Owner to Artist for use in connection with the demo, library and Masters and shall not infringe upon or violate any right of any kind of any third party.

8.    Assignment.  This Agreement is for the benefit of Owner but Owner shall have no obligation or liability to Artist hereunder. Producer shall have the right to assign, license, delegate, lend or otherwise transfer this Agreement, in whole or in part, or any or all of Producer's rights, obligations or privileges hereunder, to Owner or any designee of Owner, and this Agreement and any or all of said rights, obligations or privileges in turn may be transferred. Artist shall have no right to assign, delegate or otherwise transfer or dispose of any right, obligation or privilege hereunder to any third party.

2

9.   Miscellaneous.

(a)   This Agreement expresses the entire understanding of the parties and replaces any and all former agreements or understandings relating to Artist's Services. No modification or amendment of this Agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification or amendment, each of which must be approved ion writing by Owner. No representative of Producer has any authority to make any representation, warranty or promise not contained in this Agreement and Artist acknowledges that Artist has not executed this Agreement in reliance upon anything not expressly set forth in this Agreement.

(b)   This Agreement is made in, and shall be governed by and construed under and in accordance with the laws of, the State of California, without the application of any choice of law or conflicts of laws principles.

(c)   This Agreement may be executed by the parties individually or in any combination, in one or more counterparts, each of which shall be an original and all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first set forth above.

PRODUCER

Welsford Music Productions, LLC

By: M. WELSFORD

ARTIST

Adam Lambert

Address: 747 N Wilcox #200
Los Angeles, CA  90038

DOB: ▮▮▮▮▮▮

SS#: ▮▮▮▮▮▮

3

Exhibit 2

## CO-PUBLISHING AGREEMENT

1.     Identification. This Agreement (the "Agreement"), dated as of February 12th 2008, is entered into by and between Wilshire Publishing Limited, a limited liability company organized under the laws of the State of Nevada ("Publisher"), and ADAM LAMBERT, an individual ("Composer").

2.     Recitals.

   2.1     Composer has written and composed, in whole or in part, the lyrics and/or music of the original musical compositions identified in Schedule 1 attached hereto and incorporated herein by this reference (each, an "Existing Composition"). From time to time after the date of this Agreement, Composer will write and compose, in whole or in part, the lyrics and/or music of additional original musical compositions that will become subject to this Agreement as hereinafter provided (each, an "Additional Composition"). Each Existing Composition and each Additional Composition hereinafter sometimes are referred to as a "Composition."

   2.2     Composer has requested that Publisher exclusively publish and administer all of Composer's right, title and interest in and to each of the Compositions, and Publisher is willing to do so, on the terms, covenants and conditions hereinafter set forth.

3.     Term. The term of this Agreement (the "Term") shall commence on the date of this Agreement and, with respect to each Composition, shall continue thereafter for and during the entire term of copyright thereof throughout the world including, without limitation, all continuations, extensions, renewals, restorations and reversions of copyright now or hereafter provided under applicable law in effect at any time or times (collectively, "Copyright").

4.     Compositions. This Agreement is and shall be applicable to all of the Existing Compositions and to each Additional Composition agreed upon in writing by Publisher and Composer after the date hereof. Each Additional Composition shall be listed on Schedule 1 attached hereto by an amendment in the form of Exhibit A attached hereto and incorporated herein by this reference (each, a "Schedule 1 Amendment"); provided, however, that so long as Composer and Publisher have agreed in writing to add an Additional Composition to the scope of this Agreement, the Additional Composition automatically shall be deemed to be a Composition effective on the date of said written agreement whether or not a Schedule 1 Amendment has been or thereafter is executed by the parties.

5.     Grant of Rights.

   5.1     Composer hereby absolutely, irrevocably and unconditionally assigns to Publisher or its publishing designee an undivided fifty percent (50%) interest in and to all of Composer's right, title and interest in and to each of the Compositions including, without limitation, the Copyright therein and all rights under or related to Copyright. Without limiting the generality of the foregoing, Publisher shall:

Exhibit 2, Page 18.

       **(a)**    be the exclusive administrator of all of Composer's right, title and interest in and to each Composition and entitled to exercise any and all rights with respect to the administration, control and exploitation thereof in any and all media now known or hereafter devised including, without limitation, the exclusive right to grant licenses, collect all income and other considerations (other than the so-called "writer's share" of public performance royalties collected by any authorized performing rights society) for the full term of Copyright;

       **(b)**    be entitled to use Composer's name, nickname(s), actual or simulated likeness and biographical information concerning Composer (and the to use the name, actual or simulated likeness and biographical information concerning any other composer or lyricist of any Compositions it and to the extent Composer has acquired, or acquires, the right to do so) in and in connection with the exploitation and promotion of the Compositions and Publisher's business; and

       **(c)**    be empowered (but not obligated) to take any and all actions (including litigation and other proceedings) to protect and defend Publisher's and Composer's right, title and interest in and to the Compositions and to defend, compromise, settle and otherwise dispose of claims concerning the Compositions including, without limitation, the assignment of any right, title or interest in or to a Composition and/or any income or other considerations derived therefrom to any third party in connection with the disposition of any such claim. Composer shall be notified of any action, claim or demand brought against Publisher involving any of the Compositions and shall have the right, at Composer's sole cost and expense, to participate in the defense thereof with counsel of Composer's choice; provided, however, that Publisher's decisions in connection with any such claim, action or demand or the settlement thereof shall be final and binding upon Composer.

       5.2    Without limiting the generality of the foregoing, BMI, ASCAP and each other applicable performing rights society (as applicable, a "Society") shall be authorized and directed to pay the so-called "publisher's share" of performance fees collected by or on behalf of Composer or said Society with respect to any public performance of any Composition in the United States and Canada directly to Publisher. Concurrently with Composer's execution hereof, Composer shall execute and deliver to Publisher irrevocable instructions to each applicable Society in the form attached hereto as Exhibit B - 1 (ASCAP) or Exhibit B – 2 (BMI), and incorporated herein by this reference, and such other similar or analogous instructions as Publisher may require from time to time.

       5.3    Notwithstanding anything to the contrary contained herein, neither Publisher nor any of its licensees will issue a synchronization license for the use of any Composition in connection with any motion picture given a rating by the MPAA of NC-17 or a more restrictive rating, or in connection with any political or religious endorsement without Composer's prior written consent in each instance.

       5.4    Any assignment or other transfer ("Transfer") by Composer of any of Composer's right, title or interest in, to or derived from any Composition (including, without limitation, any lien or encumbrance thereon) shall be subject to the provisions of

this Agreement. Without limiting the generality of the foregoing, if at any time during or after the Term Composer desires or intends to Transfer any of Composer's right, title or interest in, to or derived from any Composition (including, without limitation, any right to receive any payment or other proceeds thereof), Composer shall notify Publisher thereof in writing (a "Composer Transfer Notice") specifying the applicable Composition, the right, title and interest of Composer intended by Composer to be subject to the proposed Transfer (the "Transfer Rights") and the financial terms and conditions upon which Composer intends to effect the Transfer (the "Transfer Terms"). The Transfer Terms shall be expressed in money only. The Composer Transfer Notice shall constitute an offer by Composer to Publisher to Transfer the Transfer Rights to Publisher on the Transfer Terms.

(a)     Within ten (10) business days after receipt by Publisher of a Composer Transfer Notice (the "Notice Period"), Publisher shall notify Composer in writing whether or not Publisher intends to enter into negotiations with Composer to acquire from Composer the Transfer Rights. If Publisher does not timely notify Composer that Publisher intends to enter into said negotiations, Composer may enter into negotiations and, subject to Publisher's right of last refusal as hereinafter described, an agreement with a third party to effect the Transfer of the Transfer Rights on terms not less favorable to Composer in any respect than the Transfer Terms. Any such agreement with a third party shall be entered into, if at all, within thirty (30) days after the expiration of the Notice Period.

(b)     If, during the Notice Period, Publisher notifies Composer in writing that Publisher will enter into negotiations with Composer to acquire from Composer the Transfer Rights, then Composer and Publisher promptly shall negotiate in good faith for a period of thirty (30) business days (the "Negotiation Period") regarding the terms and conditions upon which Publisher may acquire the Transfer Rights from Composer. During the Negotiation Period, Composer shall not negotiate, or enter into an agreement, with any third party concerning a Transfer of the Transfer Rights. At any time during the Negotiation Period, Publisher may elect to acquire the Transfer Rights on the Transfer Terms by written notice to Composer whereupon the Transfer Rights shall be deemed to be transferred to Publisher by Composer.

(c)     If no agreement is reached by Composer and Publisher within the Negotiation Period, Composer may enter into negotiations and, subject to Publisher's rights as hereinafter described, an agreement with a third party to effect the Transfer of the Transfer Rights on terms not less favorable to Composer in any respect than the Transfer Terms. Composer shall not, at any time, have the right to enter into an agreement with a third party to effect a Transfer of the Transfer Rights at a price or upon terms or conditions in any respect more favorable to Composer than those embodied in the last proposal made by Publisher to Composer in writing during the Negotiation Period unless Composer first offers to Publisher the right to enter into such an agreement by notifying Publisher in writing of any bona fide offer or counteroffer which Composer has received and proposes to accept from a third party (a "Bona Fide Offer"), specifying in said notice all of the terms and conditions of the Bona Fide Offer and specifically identifying the third party making the Bona Fide Offer. Publisher shall have the right to

enter into an agreement with Composer upon the same financial terms and conditions as are set forth in the Bona Fide Offer, except that the financial terms and conditions which Publisher shall be obligated to accept shall not include any term or condition which cannot be met as easily by one (1) person as another. Publisher shall have no obligation to accept any term or condition that is not a financial term or condition. If Publisher elects not to enter into such an agreement with Composer, then Composer may do so, but only with the third party, upon the same financial terms and conditions as are specified in the Bona Fide Offer and in writing within fifteen (15) days after Publisher notifies Composer in writing that Publisher will not meet the required terms and conditions as herein provided.

(d)     Composer may not enter into any agreement with any third party to effect a Transfer of the Transfer Rights other than as and when specifically permitted hereunder without again offering to Distributor the right to do so in accordance with the procedures provided for herein.

5.6     In the case of any Composition written and composed by Composer and any third party, Publisher's rights hereunder shall only extend to Composer's fractional interest therein, calculated (at a minimum) by multiplying 100% by a fraction, the numerator of which is one (1) and the denominator of which is the total number of contributing writers; provided, however, that if Publisher's ownership share of a specific Composition would be reduced below 25% by reason of the number of contributing writers, nonetheless Publisher shall be entitled to a minimum of 25% of the Copyright in and to such Composition. Without limiting the foregoing, if and to the extent that Publisher's ownership share of said Composition falls below 25%, Publisher shall have the right to reimburse itself out of Composer's share of Gross Receipts hereunder, from any and all Compositions, to the extent necessary to make up the shortfall between Publisher's actual percentage of the so-called "publisher's share" of income derived from such Composition and 25% of 100% of said "publisher's share."

6.    Representations and Warranties.

6.1     Composer hereby represent and warrants to, and further agrees with Publisher, as follows:

(a)     each Composition is and will be original with Composer or, if and to the extent another person is listed in Schedule 1 attached hereto or in a Schedule 1 Amendment as an additional composer or lyricist of a particular Composition, original with Composer and said other person and does not infringe upon or violate any right of any third party of any kind or nature whatsoever;

(b)     Composer has the full and unencumbered right, power, legal capacity and authority to enter into and perform this Agreement and to grant to Publisher all of the rights granted to Publisher hereunder without the approval or consent of any third party;



(c)    no Composition is or will be subject to any lien or encumbrance suffered or incurred or otherwise granted by Composer or any third party or subject to any agreement, commitment, license or other arrangement with any third party;

(d)    neither Composer nor anyone acting on behalf of Composer, directly or indirectly, or deriving rights from or through Composer:

(i)    has received or will receive an advance, loan or other payment from a Society or other third party which is or may be recoupable from (or otherwise subject to offset against) sums which would otherwise be collectible by Publisher hereunder; or

(ii)    is or will be subject to any so-called "controlled composition" clause under any recording agreement that may relate to any of the Compositions; and

(e)    Composer shall indemnify and hold harmless Publisher, and each of its successors, licensees and assigns, and their respective officers, directors, managers, owners, agents and other representatives from and against any and all loss, cost, damage, liability or expense (including, without limitation, legal fees and expenses) suffered or incurred arising out of, in connection with or related to the inaccuracy in any respect of any of Composer's representations or warranties hereunder or any breach or default by Composer with respect to any provision of this Agreement. Upon the making or filing of any claim or demand that is inconsistent with Composer's representations and warranties, or the performance of Composer's obligations, hereunder, Publisher shall be entitled to withhold from any amounts payable to Composer under this Agreement, or any other agreement between Composer and Company at any time (each, an "Additional Agreement"), such amounts as Company reasonably determines are related to Company's or Composer's potential liability in connection therewith.

6.2    If any record company to whom Composer, or any person or entity furnishing Composer's services, is or may hereafter may be subject to a recording agreement, charges any advance or other amount against mechanical royalties earned by any Composition from recordings made under said agreement or reduces the amount of mechanical royalties otherwise due to Composer because the mechanical royalties payable with respect to "outside material" embodied in such recordings causes aggregate mechanical royalties to exceed the per-record maximum rate prescribed in the "controlled composition" clause of said agreement, then (in addition to any other rights and remedies available to Publisher), Publisher shall be entitled to: (a) deliver a letter of direction, in Composer's name advising the applicable record company of the terms of this Paragraph and instructing said company (upon recoupment by said company from royalties otherwise payable to Composer of any portion of the advance or other amount so charged) to re-credit Publisher directly to the same extent (not to exceed the total amount originally recouped from or charged against mechanical royalties); and (b) reimburse itself from any and all monies payable hereunder for any amount charged against mechanical royalties, except to the extent later recovered by Publisher pursuant to clause (a) hereof.



Exhibit 2, Page 22.

7. <u>Compensation</u>.

7.1     Concurrently herewith, Company shall pay to Composer the sum of One Hundred Dollars ($100.00) (the "<u>Per Composition Fee</u>") with respect to each of the Existing Compositions. Upon the execution of a <u>Schedule 1 Amendment</u>, Company shall pay to Composer a Per Composition Fee for each Additional Composition listed thereon. Each Per Composition Fee shall constitute a refundable and recoupable advance by Publisher applicable against, and deductible from, any and all sums payable by Publisher to Composer hereunder (except only Per Composition Fees) and under any other Additional Agreement. If and to the extent that Composer is a co-writer of any Composition, as set forth in <u>Schedule 1</u> or a <u>Schedule 1 Amendment</u>, the applicable per Composition Fee shall be reduced pro rata based upon the number of additional writers of the lyrics and/or music thereof (for example, if Composer and another person co-wrote the music, and Composer and another person co-wrote the lyrics, of a Composition, then Composer shall be entitled to one-third (1/3) of the applicable Per Composition Fee.

7.2     From all royalties earned and received by, or finally credited to the account of, Publisher in the United States in U.S. Dollars from the exploitation of the Compositions throughout the world ("<u>Gross Receipts</u>"), Publisher shall:

(a)     deduct and retain all costs and expenses (excluding Publisher's general overhead costs) suffered or incurred by or chargeable against Publisher in or in connection with the administration, enforcement, exploitation and protection of any of the Compositions including, without limitation, the collection, enforcement and other fees and fees and costs chargeable by a collection agent, sub-publisher or administrator, copyright application and registration, lead sheets, demonstration recording costs and returns, advertising and promotion expenses;

(b)     deduct and pay royalties payable to all of the writers of the Compositions which shall not, and Composer represents and warrants to Publisher shall not, exceed the royalties provided for in <u>Schedule 2</u> attached hereto and incorporated herein by this reference and which shall not include any of the so-called "publisher's share" of public performance income;

(c)     pay to Composer an amount equal to fifty (50%) percent of the balance remaining after deducting the aggregate sums set forth in subparagraphs (a) and (b); and

(d)     retain for its own account the remaining fifty percent (50%) thereof.

7.3     Notwithstanding the foregoing, the amount payable to Composer, if any, pursuant to Paragraph 7.2 above shall be reduced proportionately in the same fashion as the applicable Per Composition Fee is reduced pursuant to Paragraph 7.1 above if Composer is not the sole writer of the lyrics and music of the applicable Composition.

8. <u>Payment and Accounting</u>.

Exhibit 2, Page 23.

8.1     Within ninety (90) days after the close of each semi-annual period ending on June 30th or December 31st of any year, Publisher shall render a written accounting statement (each, a "Publisher Statement") to Composer setting forth all Gross Receipts received by Publisher during the immediately preceding semi-annual period, specifying in reasonable detail the source thereof and all sums, if any, payable to Composer pursuant to Paragraph 6 hereof and all amounts recoupable or deductible hereunder. Each accounting statement shall be accompanied by payment to Composer of the amount shown thereon to be due to Composer in excess of $250.00. In addition to any other recoupable or deductible amount, Publisher shall be entitled to deduct any taxes, levies or other sums required to deducted pursuant to any applicable federal, state, local or other law, rule or regulation. Publisher shall have the right to retain as a reserve for future recoupable or deductible sums such portion of the Gross Receipts otherwise payable to Composer hereunder as Publisher may determine to be reasonable and appropriate under the circumstances.

8.2     Each and every matter and transaction contained in a Publisher Statement shall be deemed final and binding upon, and not subject to any objection, by Composer for any reason unless specific objection in writing, specifying in detail the matters or transactions to which Composer objects, is delivered by Composer to Publisher within one (1) year after the rendition of the first Publisher Statement containing such matter or transaction (which conclusively shall be deemed to have been received by Composer when due unless Composer delivers written notice to Publisher that such statement was not timely received within thirty (30) days after the due date). Composer shall be barred from maintaining or instituting any kind of action or proceeding whatsoever with respect to any matter or transaction to which Composer has objected unless such action or proceeding is commenced within six (6) months after the date that Composer delivers timely written objections to Publisher. Composer irrevocably and unconditionally waives the benefit of any applicable law, rule or regulation under which Composer may be entitled to an accounting with respect to Gross Receipts or any other sum and agrees that accountings hereunder shall not be deemed an open book or book account between the parties. Composer irrevocably and unconditionally acknowledges and agrees that the relationship between Composer and Publisher with respect to all matters including, without limitation, the payment of Composer's share of Gross Receipts hereunder, is that of creditor and debtor only and that there is no fiduciary relationship between Composer and Publisher and Composer hereby waives any right to make any claim to the contrary. Nothing contained in this Agreement or otherwise shall be construed to create a trust or specific fund as to Gross Receipts or any sum payable hereunder or to prevent Publisher from commingling any funds or to give Composer a lien with respect thereto or an assignment of any portion thereof. Publisher's obligation to pay Composer any sum hereunder shall not bear interest nor entitle Composer to any gains which may accrue prior to payment. Publisher Statements may be changed from time to time to give effect to adjustments made by Publisher's accounting department. If Publisher makes an overpayment to Composer for any reason, Composer shall repay such overpayment to Publisher promptly following Publisher's request or Publisher may deduct such overpayment from any other sum due to Composer pursuant to this Agreement or any Additional Agreement.



Exhibit 2, Page 24.

8.3    Publisher shall maintain books of account concerning the share of Gross Receipts payable to Composer hereunder. Composer or a certified public accountant on Composer's behalf, at Composer's sole expense, may examine Publisher's books of account with respect to Composer's share of Gross Receipts payable hereunder, that have not become incontestable, solely for the purpose of verifying the accuracy of Publisher Statements rendered. Such examination shall take place where such books of account are maintained during Publisher's normal business hours and upon not less than thirty (30) days advance written notice delivered to Publisher and not more often than once each calendar year. Any such examination shall be conducted in such manner so as not to interfere with Publisher's normal business activities. Publisher Statements may be examined only within one (1) year after the date rendered and Publisher shall have no obligation to permit Composer to examine Publisher's books of account relating to any particular Publisher Statement more than once. Under no circumstances shall Composer or Composer's representative have the right to examine books of account or any other books, records, statements, reports or information relating to Publisher's business generally or with respect to any matter other than the Compositions for which the applicable Publisher Statement was rendered. The rights herein granted to Composer shall constitute Composer's sole and exclusive right to examine Publisher's books of account and records. Each examination shall be conditioned upon Composer's and its accountant's written agreement with Publisher not to voluntarily disclose any information obtained in connection with any such examination to anyone other than Composer and Composer's legal and financial advisers. If Composer commences any action or proceeding concerning any Publisher Statement or any sum alleged to be due to Composer hereunder, the scope thereof shall be limited to a determination of the amount due for the accounting periods concerned and the applicable tribunal shall have no authority to consider any other issues or award any relief other than the payment to Composer of any sum found owing.

9.     **Additional Documents.**     Composer promptly shall deliver to Publisher an accurate and complete copy of Composer's songwriter and other agreements with each other writer or composer, if any, of each of the Existing Compositions and, when entered into by Composer, each of the Additional Compositions. Composer shall take all such further actions, and execute, acknowledge and deliver to Publisher any additional documents and instruments, that Publisher reasonably may require from time to time to enforce, evidence, perfect, protect, record and otherwise effectuate Publisher's rights hereunder including, without limitation, applications for copyright registration, assignments and other instruments of transfer and directions to pay. Composer hereby absolutely, irrevocably and unconditionally appoints Publisher as Composer's attorney-in-fact to take any such action and to execute, acknowledge and deliver any such further document or instrument (it being acknowledged that such appointment is irrevocable and shall be deemed a power coupled with an interest), with full powers of substitution and delegation, which power shall survive Composer's subsequent incapacity.

10.    **LEGAL COUNSEL.** **COMPOSER HEREBY ACKNOWLEDGES AND AGREES THAT: (A) COMPOSER HAS SECURED, OR HAS HAD EVERY OPPORTUNITY TO ENGAGE, LEGAL COUNSEL TO REPRESENT**

COMPOSER IN CONNECTION WITH THIS AGREEMENT AND HAS ENTERED INTO THIS AGREEMENT AFTER FULLY CONSULTING WITH SUCH COUNSEL OR DETERMINING NOT TO ENGAGE SUCH COUNSEL; (B) COMPOSER OR COMPOSER'S COUNSEL HAVE HAD EVERY OPPORTUNITY TO INVESTIGATE AND INQUIRE ABOUT ALL OF THE RELEVANT FACTS AND CIRCUMSTANCES IN CONNECTION WITH COMPOSER'S ENTERING INTO THIS AGREEMENT; (C) IF COMPOSER HAS ELECTED NOT TO ENGAGE LEGAL COUNSEL, SUCH ELECTION WAS MADE SOLELY BY COMPOSER WITHOUT ANY INFLUENCE OR INTERFERENCE BY PUBLISHER OR ANYONE RELATED TO PUBLISHER.

11.     <u>Governing Law</u>.     This Agreement shall be construed in accordance with and governed by the laws of the State of California, applicable to agreements made and to be performed entirely in California and without reference to its choice of law principles or rules. Any legal action or proceeding with respect to this Agreement, or any other agreement, document or instrument executed in connection herewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against any party, may be brought in the courts of the State of California, or in the federal courts of the United States, located in Los Angeles, California, provided always that suit also may be brought in the courts of any place where any party may be found. Each of the parties hereto hereby irrevocably waives any objection which it may now or hereafter have to the venue of any such action or proceeding, brought in any such court of the State of California, or in the federal courts of the United States, located in Los Angeles, California; and hereby further irrevocably waives any claim that any such action or proceeding brought in any such court is brought in an inconvenient forum.

12.     <u>Notices</u>.     Except as otherwise specifically provided herein, any notice, statement, payment, request, demand or other communication (collectively, "<u>Notice</u>") provided for hereunder to be given shall be in writing and shall be personally served or sent by United States mail, by courier or telecopier and shall be deemed to have been given when personally delivered, deposited in the United States mail, registered or certified, with postage prepaid, delivered by courier or sent by telecopier with receipt confirmed. The addresses and telecopier numbers of the parties hereto (until notice of a change thereof is served as provided in this paragraph) shall be as set forth on the signature page below. Composer hereby irrevocably and unconditionally agrees that delivery of Notice to any person of which Composer is constituted, if more than one, shall be effective delivery thereof to all such persons.

13.     <u>Severability</u>.     If any provision of this Agreement shall be invalid, illegal or unenforceable in any jurisdiction then, as to such jurisdiction only, to the minimum extent of such prohibition or unenforceability, such provision shall be deemed severed from the remainder of this Agreement and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

14.     <u>Entire Agreement</u>.     This Agreement, and the other agreements, documents and instruments contemplated hereby, constitutes the entire agreement between the parties

hereto with respect to the matters set forth herein and therein and may not be amended, waived or modified in any manner without the specific written consent of each party. Any breach or failure by Composer to perform or observe any of its representations, warranties, covenants, agreements or obligations under, arising out of, in connection with or related to this Agreement, at Publisher's election, shall be deemed to be a breach or failure by Composer under this Agreement and any agreement between Publisher and Composer entered into at any time.

15.    Survival of Representations and Warranties.    All representations and warranties of Composer contained herein shall survive the execution, delivery and performance of this Agreement and any other agreement, document or instrument contemplated hereby.

16.    Failure or Indulgence Not Waiver.    No failure or delay on the part of Publisher in the exercise of any power, right, remedy or privilege under, arising out of, in connection with or related to this Agreement or any other agreement, document or instrument contemplated hereby shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy or privilege preclude any other or further exercise thereof or of any other right, power, remedy or privilege. All rights and remedies of Publisher under, arising out of, in connection with or related to this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

17.    Assignability.  Company freely may assign or delegate any or all of its rights or obligations hereunder or any right, title or interest herein without the consent of or notice to Composer. Any such assignment to an entity that is then financially responsible shall relieve Company of any further obligation or liability hereunder and said assignment shall constitute a novation as between Company and Composer. Composer may not assign or delegate any of Composer's rights or obligations hereunder, in whole or in part, or any right, title or interest herein without the prior written consent of Company in each instance and any purported assignment or delegation in violation hereof shall be void and of no force or effect.

18.    Binding Effect.        This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.

19.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same document. This Agreement may be transmitted for reproduction and execution by any means now known or hereafter devised including, without limitation, facsimile or electronic file transmission, may be converted from its original software format to another and/or printed on different paper formats or in different fonts, any or all of which may result in variations to the pagination and appearance of the counterpart versions of this Agreement. The execution and delivery of counterparts of this Agreement with facsimile or original manual signature, regardless of the means of delivery or any such variation in pagination or appearance shall be binding upon the parties executing this Agreement. Any party delivering an executed counterpart by facsimile shall also deliver a manually executed counterpart to

Exhibit 2, Page 27.

each other party, but failure to do so shall not affect the validity, enforceability or binding effect of this Agreement.

20.   **Section and Paragraph Headings.**   The various headings used in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

21.   **Sole Discretion.**   For the purposes of this Agreement, "sole discretion," "sole and absolute discretion" and similar terminology means the absolute and unfettered right of Publisher to decide upon a course of action or inaction, without regard to the fairness, reasonableness or timeliness thereof. Composer acknowledges that, in the absence of this paragraph, a court might imply a duty on the part of Publisher to act "fairly" or "reasonably" in deciding upon a course of action or inaction and that this paragraph is intended to operate as an express disclaimer by Composer of reliance upon any implied duty of fairness or reasonableness.

22.   **No Partnership.**   This Agreement is not intended to form or constitute a partnership, joint venture or similar entity between or among the parties hereto and no party hereto shall represent to the contrary, expressly or by implication. No party hereto shall have any right or authority to enter into any agreement, obligation or liability on behalf of, or that shall be binding upon, any other party hereto unless and only to the limited extent specifically provided for in this Agreement to the contrary.

23.   **Remedies.**

23.1   In the event of a breach or alleged breach of this Agreement by Publisher, the sole right and remedy of Composer, if any, shall be an action at law for damages, if any, and in no event shall Composer be entitled to terminate or rescind this Agreement or any of the rights granted hereunder or to enjoin, restrain or otherwise impair the exploitation of any of Publisher's rights hereunder. No act or omission of Publisher in any event shall constitute an event of default or breach of this Agreement unless Composer shall first provide written notice to Publisher setting forth the alleged breach or default and Publisher shall not cure such breach or default within thirty (30) days after receipt of said notice.

23.2   Composer acknowledges and agrees that the Compositions and Publisher's rights hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that in the event of a breach or default by Composer of any provision of this Agreement, Publisher shall be entitled to specific performance of this Agreement and to temporary, preliminary and permanent injunctive and other equitable relief in addition to any other remedy Publisher may have under this Agreement or otherwise, without any requirement to prove the inadequacy of any remedy or to post any bond or other surety.

24.   **Neutral Construction.** This Agreement and its provisions, and the other agreements, instruments and documents referred to herein, are each the product of

negotiation between or among the parties hereto and their respective attorneys, each of whom has participated actively in the drafting and negotiation of this Agreement and the other agreements, documents and instruments referred to herein. In construing and interpreting this Agreement and the other agreements, documents and instruments referred to herein, each of the parties hereto acknowledges and agrees that no provision of this Agreement, or of any other agreement, document or instrument referred to herein, shall be construed or interpreted against any party because any provision, or any agreement, document or instrument as a whole, purportedly was prepared or requested by such party or its attorney.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above-written.

| WILSHIRE PUBLISHING LIMITED | ADAM LAMBERT |
|---|---|
| _____ <br> By: Michael Burtscher, Managing Member <br><br> _____ <br> _____ <br> Telecopy No.: _____ | _____ <br><br> Address: 747 N. Wilcox #200 <br> Los Angeles, CA 90038 <br><br> Telecopy No.: <br> Date of Birth: ▆▆▆▆▆▆ <br> Social Sec. No: ▆▆▆▆▆▆▆ |

## SCHEDULE 1

## COMPOSITIONS

*(handwritten note in left margin: "Included in Album Release")*

| Title | Copyright Reg. No. and Date | Writer(s) | Percentage | Society | Address |
|---|---|---|---|---|---|
| Beg For Mercy | AKA "My Skins Cohide" | M. Pittman — Adam Lambert | 37.5% — 12.5% | ASCAP — | |
| Turning On | AKA "Palsibg" | M. Pittman — A. Lambert | 25% — 25% | ASCAP — | |
| Pop Goes The Camera | AKA "15 Minutes of Fame" | M. Pittam — A. Lambert | 25% — 25% | ASCAP — | |
| The Circle | | M. Pittman — A. Labert — Tommy Victor | 38.00% — 5% — 12% | ASCAP — | |
| Rough Trade | AKA "Pride" | M. Pittman — A. Lambert | 25% — 25% | ASCAP — | |
| Crawl Thru Fire | AKA "Stars & Mirror" | M. Pittman — A. Lambert | 23% — 25% | ASCAP — | |
| Runaway | AKA "Parade" | M. Pittman — A. Lambert | 25% — 25% | ASCAP — | |
| Just The Way It Is | AKA "The First" | M. Pittman — A. Lambert | 25% — 25% | ASCAP — | |
| Kiss & Tell | "Hiss" | M. Pittman — A. Lambert | 25% — 25% | ASCAP — | |
| MP3's | | M. Pittman — A. Lambert | 25% — 25% % | ASCAP — | |

*(handwritten note in left margin: "10 Songs")*

*(handwritten notes at bottom left:)*
Plus
Identities of
1. Beg for Mercy
2. 15 minutes of Fame
3. Hiss

*(handwritten note at bottom center:)* 1st Song "Sacrifice" { Writes?

**EXHIBIT B - 1**

**FORM OF DIRECTION TO ASCAP**

February 12th 2008

American Society of Composers,
Authors & Publishers
One Lincoln Plaza
New York, NY 10023

Re: Adam Lambert

Gentlepersons:

You are hereby irrevocably authorized and directed to pay to my administrator, Wilshire
Publishing, LLC ("Administrator"), at 297 Kingsbury Grade, Suite D, Post Office Box 4470 Lake
Tahoe, NV 89449-4470, and I hereby irrevocably assign exclusively to Administrator, all monies
payable by you from and after the date hereof (regardless of when earned) as the publisher's share
of performance royalties with respect to the musical compositions described below: Titles of
existing compositions

1. Beg For Mercy
2. Turning On
3. Pop goes the Camera
4. The Circus
5. Rough Trade

In addition to the foregoing listed musical compositions, this letter shall apply to each and every
additional musical composition owned or co-owned by the undersigned from and after the date
hereof until you receive contrary written notice from the Administrator.

Copies of all royalty statements and other communications from you shall be sent concurrently to
the Administrator and to me.

The foregoing authorization and direction shall remain in full force and effect until modified or
terminated in writing delivered to you and signed by both the undersigned and the Administrator.

Very truly yours,

Adam Lambert

Exhibit 2, Page 31.

**EXHIBIT B - 1**

**FORM OF DIRECTION TO ASCAP**

February 12th 2008

American Society of Composers,
Authors & Publishers
One Lincoln Plaza
New York, NY 10023

Re: Adam Lambert

Gentlepersons:

You are hereby irrevocably authorized and directed to pay to my administrator, Wilshire
Publishing, LLC ("Administrator"), at 297 Kingsbury Grade, Suite D, Post Office Box 4470 Lake
Tahoe, NV 89449-4470, and I hereby irrevocably assign exclusively to Administrator, all monies
payable by you from and after the date hereof (regardless of when earned) as the publisher's share
of performance royalties with respect to the musical compositions described below: Titles of
existing compositions

1. Runaway
2. Just The Way It Is
3. Kiss & Tell
4. MP3's Killed The Record Company
5.

In addition to the foregoing listed musical compositions, this letter shall apply to each and every
additional musical composition owned or co-owned by the undersigned from and after the date
hereof until you receive contrary written notice from the Administrator.

Copies of all royalty statements and other communications from you shall be sent concurrently to
the Administrator and to me.

The foregoing authorization and direction shall remain in full force and effect until modified or
terminated in writing delivered to you and signed by both the undersigned and the Administrator.

Very truly yours,

Adam Lambert

EXHIBIT 3

# GANG, TYRE, RAMER & BROWN, INC.
### ATTORNEYS AT LAW

BRUCE M. RAMER
DONALD S. PASSMAN
HAROLD A. BROWN
TOM R. CAMP
LAWRENCE D. ROSE
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL

BARBARA SILBERBUSCH
J. EUGENE SALOMON, JR.
CHERYL M. SNOW
BIANCA J. LEVIN
TARA S. KOLE
DANIEL S. PASSMAN
KENNETH O. GARRETT
ETHAN B. SCHIFFRES

OF COUNSEL
CHARLES A. SCOTT
STANLEY P. GOLO

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

## RECEIVED

October 11, 2011

OCT 1 7 2011

AMAZON.COM, INC.
LEGAL DEPARTMENT

**VIA E-MAIL AND U.S. MAIL**

Copyright Agent
Amazon.com Legal Department
P.O. Box 81226
Seattle, WA 98108
copyright@amazon.com

CONFIRMATION COPY

Re:    **Adam Lambert -- "Beg For Mercy"**

To Whom It May Concern:

Our firm represents Adam Lambert ("Artist"). Artist is the owner or co-owner of the copyright in musical compositions and recordings on the unauthorized CD called "Beg For Mercy" (hereinafter, "BFM CD").

It has come to our attention that Amazon.com is currently offering for sale the BFM CD, which is due to be released October 18, 2011. This offer may be found on the following pages: http://www.amazon.com/Beg-Mercy-Adam-Lambert/dp/B005OLUOT2 and http://www.amazon.com/Adam-Lambert/e/B002HFPKPG/ref=ac_dpt_sa_bio . Upon information and belief, the BFM CD includes so-called "demo" tapes of the following compositions written or co-written by Artist: Beg For Mercy; Crawl Thru Fire; Want; Kiss and Tell; Just The Way It Is; Turning On; Runaway; 15 Minutes of Fame; The Circle; and mp3 Killed the Record Companies.

The distribution, promotion and other exploitation of the BFM CD has not been authorized by Artist (or any agent of Artist). Among other things, the parties to the underlying recording agreement had agreed in writing that none of these recordings would be shared or sold without Artist's prior written consent. Artist has not consented, and to the contrary, objects to the release of these demo recordings. Moreover, all agreements respecting the above referenced recordings and compositions were lawfully rescinded in writing on June 23, 2009, and confirmed in writing July 8, 2009, for the undisputed failure to pay the contractual consideration. See California Civil Code Section 1689(b)(2) ("[A] party to a contract may rescind the contract . . . [i]f the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds"). With the rescission of these agreements, all rights (including copyrights) in the songs and recordings at issue return to Artist.

1720176.1

Exhibit 3, Page 33.

# GANG, TYRE, RAMER & BROWN, INC.

Re:  Adam Lambert -- "Beg For Mercy"
October 11, 2011
Page 2

By this letter, we demand that Amazon.com immediately "takedown" all advertisements, announcements and web pages displaying, promoting, distributing or selling the BFM CD, including those specifically identified above.  We further demand that there be absolutely no sale, distribution or other exploitation of the unauthorized BFM CD on Amazon.com or any related website.

The contact information for Artist is:

Adam Lambert
c/o Gang, Tyre, Ramer & Brown, Inc.
132 S. Rodeo Drive
Beverly Hills, CA 90212
Attn:   Donald S. Passman
Tel.:    (O): 310-777-4800
Email:  dsp@gtrb.com

Artist indeed has a good faith belief that the public display, reproduction, sale and distribution of the BFM CD is wholly unauthorized and is likely to cause irreparable damage to Artist.

We affirm that the information in this Notice is accurate.  Under penalty of perjury, the undersigned is authorized to act for Artist.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By
Donald S. Passman

cc:     Adam Lambert
Kevin S. Marks

1720176.1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV11- 9062 PA (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Joseph L. Golden (S.B. No. 61293)
Law Office of Joseph L. Golden, 1801 Century Park
East, 24th Flr., Los Angeles, California 90067
Tel. 310-556-9666 - F: 310-556-9625
Email: jlgoldenesq@verizon.net

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

COLWEL PLATINUM ENTERTAINMENT, INC.,
a New York Corporation
                                                    PLAINTIFF(S)
                              v.
ADAM LAMBERT, an individual,

                                                    DEFENDANT(S).

CASE NUMBER

CV11-9062-PA(MANx)

**SUMMONS**

TO:      DEFENDANT(S): ADAM LAMBERT

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Joseph L. Golden, Esq._____, whose address is _1801 Century Park East, 24th Flr., Los Angeles, CA 90067-2302_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _11-1-11_                   By: _____
                                              Deputy Clerk

                                              *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>Colwel Platinum Entertainment, Inc. | DEFENDANTS<br>Adam Lambert |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Joseph L. Golden (S.B. No. 61293)<br>Law Office of Joseph L. Golden, 1801 Century Park East, 24th Flr.<br>Los Angeles, California 90067 Tel. 310-556-9666 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** According to proof at trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
17 U.S.C. sec. 512(f). The first claim seeks damages for defendant's violation of 17 U.S.C. sec. 512(c) in sending a "takedown notice" to Amazon.com

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No ☑ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | New York |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date October 31 , 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |